v. United Transportation Union. Judge Ackerman has a question. I suppose I should address it to you, Mr. Wilder. Introduce yourself on the tape first, and then we'll see where we go. Good morning. My name is Roland P. Wilder, Jr., representing the plaintiff's appellant. Mr. Wilder, as I was going over these briefs for the umpteenth time, this question came to me in the middle of the night. You've been litigating seniority fee agreements for over 15 years, and neither union has had any success in evaluating these agreements. In the meantime, to my way of thinking, workers at both unions have had to pay as much as double union dues to preserve their seniority. Many courts, particularly the Seventh Circuit, through Judge Posner, have urged the unions to sit down with each other and reach a cost-sharing agreement so that the unions are fairly compensated for the services they provide to non-members and your workers do not suffer undue financial help. My question is, why are you still fighting, losing battles against each other in court instead of working together to protect your workers' interests? Your Honor, the parties, the UTU and the BLET, made a very serious effort to do just what Judge Posner had suggested in connection with their conventions in 2006 and 2007. This case was suspended during the period of that effort, and I am sorry to report that the effort failed. We are here because we are convinced that the law of the Third Circuit Court of Appeals… Before you get there, you attempted to settle this case or there was an alternative dispute resolution mechanism that was invoked? No, we attempted to settle the case. There is no alternative dispute resolution method available to settle this dispute between the carriers and the organizations. Even though the Supreme Court said in TWA that there is virtually endless dispute resolution mechanisms in the Railway Labor Act? Justice O'Connor in the TWA v. HIPAA case was speaking of major disputes which occur over the formation of agreements and the procedures that must be exhausted in order to settle those agreements and what happens afterwards. She was not referring to… Post-certification disputes. That's correct. So now you want to come in and say we should follow Brady, our case. Was that ever raised in Dempsey or Kansas City Southern or Whiteman or is that raised because you're in the Third Circuit now? Not so far as our research has been able to determine. The Brady case itself I do not believe was cited in the earlier cases. It wasn't cited in the opinions whether it was raised to those circuits. I don't know. I can say that… It's a 40-year, maybe an oldie but a goodie, but it sure is an oldie from the Third Circuit. I mean that was decided before I was born and now you're, well, almost. 68, right? And this is the first time you're invoking Brady? The case of radio officers arising under the National Labor Relations Act was dealt with in some of the earlier cases. Well, that's an NLRA case. That's correct. And didn't TWA kind of say, did say, you can't import the principles of the NLRA wholesale into this and in fact you can't do an awful lot with it? If the statutory schemes are inconsistent, that is certainly true. Well-founded analogies between the NLRA and the RLA are accepted, however. I am going to keep quiet now and let you make your argument. How about that? I welcome questions. That way I know what you're thinking of. Frankly, we've had a lot of practice in this area, so we know what we're thinking of on that. But the question before this court is whether the rail carriers violated Section 2.4 of the Railway Labor Act and the UTU violated its duty of fair representation by entering into and enforcing an agreement which requires non-member employees to pay the equivalent of union dues to the UTU in order to avoid the loss or interruption of their seniority rights. We submit that the answer to this question must be yes according to the law of the circuit and the structure of the statute. There are three reasons. First, the so-called LOI influences or coerces employees to join the UTU or to remain a member of the UTU and to forbear from joining the DLET or remain a member of the DLET. That's one claim that's drawn directly from Section 2.4. The second claim involves the carrier's violation of the prohibition in Section 2.4 from aiding the UTU in the collection of dues and fees. This is an independent prescription. Neither of these prescriptions in Section 2.4 are saved from illegality by the safe harbor provisions of Section 2.11. This is important because this is the structure of the statute that this court adopted in the Brady case. Now, this arcane statutory language takes on life and meaning by being looked at through the eyes of Plaintiff Tompkins in this case. Plaintiff Tompkins is an employee of the CSX Railway. He has never been involved in one of these cases before. He is a trained engineer, but he works as a trainman within the jurisdiction of the UTU. Mr. Tompkins, however, is chosen to be a member of the DLET. Now, the LOI presents Mr. Tompkins with these stark situations. First, he can quit the DLET and join the UTU and avoid the payment of dues of their equivalent to both organizations. Second, Mr. Tompkins can pay dues of the equivalent to both organizations. Or third, he can simply continue to pay his dues to the DLET, not pay the equivalent to the UTU, and suffer a diminution of his seniority rights that will adversely affect him in every term or condition on which seniority depends. Look, Mr. Tompkins aside, under Section 3 of the LOI, an engineer need not pay UTU to retain his train service seniority unless DLET already has a requirement that UTU members pay to retain engine service seniority. If DLET does it, how can DLET complain about other unions doing it? Mr. Tompkins does not work as an engineer. He works as a trainman. But he's one of your co-plaintiffs here. There are two facets of the agreement. One, as it affects engineers working as engineers, which is what the court is referring to. All right, that's fair. But Mr. Tompkins does not work as an engineer. He works as a trainman, belongs to the DLET, and consequently he suffers the detriment that I described under the LOI. The different provisions affect differently people depending on where they're working. Yes, no, I understand. Right, all right. And that's why I make that point. But as I say, Brady held that a union security discharge not shielded by Section 211 violates Section 2.4 in that the employer's conduct inherently encourages or discourages union membership. That's where we are here. That's what the LOI does, and that's why we claim that it's a violation of Section 2.4. Now, the defendants contended below and contended here that Brady must be overruled, that this court should align itself with the seriously flawed decisions of the first, seventh, and eighth circuits. And I guess also we should not rely on TWA, right? Our point is that TWA has nothing whatever to do with this case. It involves the major dispute provisions of the statute. There is nothing in TWA including the reference to pre-certification or post-certification conduct that implicates the law of the circuit. In IAM versus Northwest Airlines, this court made very clear that Mr. Walther, so many courts have said to you, not just to you, we're sick of these disputes. It just represents fratricide amongst two unions who won't get off each other's back for eons. And that's what it appears to me, I confess to you. It's tiresome. I mean, I could well understand if the union had a gripe against an employer in a particular case, but this goes on and on and on and on, and it represents to my mind, and not only to my mind, merely an extension of a never-ending war between two unions who are vying for charm school in terms of the loyalty and affection of their respective unions. It's very disconcerting, I must tell you that, sir. I'm speaking obviously only for myself. Let me point out that the alternative is perhaps worse. The carriers offered the DLET a seniority maintenance agreement that would require many, many operating employees in the industry. And this case involves the entire industry, so it likely will be the last one. But the alternative is that all the operating employees working in different crafts, engineers on the one hand, or trainmen on the other, are moving back and forth, would have to pay dues to both, to their chosen representative, and pay the equivalent of dues to the other organization. And it was the DLET's firm belief that when this case was filed, we should try to end the situation. Thank you. Did you reserve, excuse me, rebuttal time, Mr. Wilder? I did. I reserved five minutes. Mr. Miller. Good morning, Your Honors. May it please the Court, I'm Clinton J. Miller III. I'm General Counsel to the Appellate United Transportation Union. And to answer Judge Ackerman's question, there were serious efforts at merging these two organizations. And in 2001, it was enjoined by the Federal District Court in the Northern District of Ohio because of a perceived defect that affected Lanham Griffin. When it was sent back out for ratification, it was ratified by the UTU side. It was not ratified by the BLE side. I agree, we have met each other coming and going with respect to this issue and these issues that are involved here. I recall in the Corzine case, where it was the BLE who made the seniority maintenance agreement, and we still felt that that violated our rights under Section 211C. I wrote the brief, but I sent my associate to the Seventh Circuit argument, and he said it began when Judge Easterbrook said, who had been on the Dempsey panel, you know, you were on the other side of this issue in the Dempsey panel. What do you think we are, stupid? And it went downhill from there. It's clear that the law with respect to the specific issues here has been settled by three circuits, all of whom have rejected the arguments that both UTU and BLET have made to them with respect to 211 and 24. I will say, Judge Ackerman, that this provision no longer applies. As we noted in our brief at footnote one, it expired by its own terms as extended on March 1, 2007. And there is scant likelihood that there is any appetite to revive it. The only reason that... Is this case moved? I suggested that in the mediation phase. We talked about that. The problem is that one of the individual plaintiffs has a damage claim. So with respect to his damage claim, I suppose it's not moved. Other than that, this case is moved? Yes, Your Honor. In my belief it is. Well, boy, I think we're being asked to do a little extra work. I mean, how much is the damage claim? How much could be involved? It's never gotten to that stage. Well, I don't know how much the union dues are, but if it's paying two dues, I'd have to think that this case costs a lot more than what's involved. Which was the suggestion, Judge Greenberg? I would... I don't know. That's why I made the suggestion, Judge Greenberg. That's why I suggested mootness when we were... Well, I would have moved to dismiss on mootness. The suggestion is pretty veiled. I haven't seen it. There hasn't been a motion to dismiss. It hasn't jumped out at me, I'll tell you. There hasn't been a motion to dismiss. No, we did not move to dismiss because of the damage claim, which I thought I couldn't move to dismiss the whole case because technically that's still at issue. How much is involved in the damage claim? Well, I don't know how much Mr. Wilder intends to assert, but union dues for each of these two unions probably approximate less than $100 a month. For how many months? It was for a confined period, I would say it went on for about a year and a half or two years, the agreement was itself. Are those the damages, Mr. Wilder? Yes, they are damage claims. For a year and a half of dues for one person? Yes. For a year and a half of dues for one member? Is that what it is? Is that what's involved? We have two individual claims. A year and a half of benefits for two individuals? Two individuals. Is that what... Two individuals. There's no class action here. There's no class action. You have two individuals who are looking for their dues for a year and a half. Is that correct? Well, in the case involved, you're saying that could have further consequences. But the case involved was dealing with a confined period of dues for two people. Is that right? Yes, Judge Ginsburg. That's correct in my view. Well, we have to thank you for the opportunity to do this case. Counsel to sidebar, turn off the tape, please. Thank you. We're going to start the time running again and we will see where we go. Mr. Miller, I have no idea how much time you have left, but I'm not holding anybody to the clock. Well, Judge Berry, I don't feel compelled to use it all. You should understand, though, that we really examined this and we understand the issues. I agree. And we understand the precedents and we understand how it all relates. We fought for all arguments because, you know, the case seemed emergent. But we do understand that it ought to be evaluated. And with that, Judge Greenberg, I will take my leave. Oh. Mr. Reiner. May it please the Court, I'm Thomas Reiner. I represent the Five Railroad of Belize. I want to respond to some of the Court's concern about why this case is here and where it leaves them. This case is moot in part. And keep in mind there were two separate provisions. One of them was contingent upon there being a similar agreement with the BLET. I think that's paragraph two. And I don't believe that's applicable. The entire agreement went away March 1, 2007. TWA v. IFA really was an adoption of this Court's Third Circuit approach under 2.4. I actually presented an amicus on behalf of the airline industry that argued that. So that is what TWA v. IFA is dealing with. And the Court instructed that the Federal District Court shouldn't intervene under 2.4 unless it's necessary to make the Act's procedures work. And you should avoid being embroiled in partisan ends. And that's what the Court would do. But we don't have any, apparently, any alternative dispute procedures here that are applicable in this post-certification case, union v. union, right? So why can't the Court intervene in such a case? We believe that TWA v. IFA was not limited to what you would call alternative dispute resolution procedures. The procedure that would address this process... No, it wasn't limited to that. But your friend, Mr. Wilder, said it limits those to, largely limits those to the pre-certification. Well, it is largely limited to pre-certification. And what the major post-certification procedure of the Railway Labor Act is, is collective bargaining. And this issue has been addressed in collective bargaining by the carriers with both unions. These are longstanding relationships. These relationships go back at least to 1951, when 211th was adopted. There has been no case under TWA v. IFA that has invalidated a collective bargaining agreement term. Period. And this particular term, these seniority maintenance provisions, have been negotiated by both sides in the industry. But they came out of the agreement in 2007. It's not applicable with the major carriers now. The same provision was offered to the BLET. They turned it down. That means there's no discrimination involved here. So the carrier's answer to the court is, leave this where it is. Throw it back to them. They can either resolve it by talking to each other or through collective bargaining with the carrier. And that's what the act intended. This is not an interventionist federal statute. The Supreme Court has repeatedly said that it wants to keep Railway Labor Act disputes out of the court. That's why things go to the Adjustment Board. That's why they go to the Mediation Board. The other place they go is collective bargaining. And that is where this dispute belongs. Thank you. Why were the railways willing to enter into a letter of intent here in the first instance? Because in Dempsey and Kansas City Southern, the seniority fee provisions were agreed to by the railways to try to avert a nationwide labor strike. Right. Here you don't have anything of that. Well, this is national bargaining. So when you're in collective bargaining, the ultimate possible outcome is a nationwide dispute. You know, the old adage about... But then doesn't that make it fun to... Well, go ahead. The old adage about laws and sausages applies even more so in the way that the context for negotiating this with the UTU was job reduction proposals. And this was a protection of what would happen related to job reduction proposals. That was the context in which it was negotiated. But it was arms-length collective bargaining. Thank you. Thank you. Yes, sir. The opportunity to rebut allows me to pick up with TWA versus IFA to emphasize once again that that case involved a major dispute and the kind of conduct  could engage in without the need to negotiate a major dispute with TWA versus IFA. Without judicial interference once the statutory procedures ran their course. It was unexceptional. In fact, this was the third time in some 15 years in which the Supreme Court has said that the courts ought not to interfere with economic, self-help activities that are peaceful in those circumstances. Justice O'Connor's opinion But this case is fundamentally different from TWA. So why should we back off? Why what? Should we back off? Because this case is different from TWA. Yes, that's correct. And there's another point, too. And that's the difference between a pre-certification and a post-certification dispute. Now, Section 2.4 attaches both pre-certification and post-certification. But in a post-certification format, once there is a collective bargaining agreement, the adjustment board, the arbitrator, has exclusive jurisdiction over the dispute. So a court faced with a Section 2.4 claim in the context of an existing collective bargaining agreement has to determine whether it has jurisdiction or whether the adjustment board has jurisdiction. This court dealt with that in IAM versus Northwest Airlines by saying that when the carrier comes forward and shows that the case is an ordinary one involving the interpretation of an agreement by the adjustment board, it is incumbent on the union to come forward and to show or to back up its claim that the carrier is acting to affect adversely its representative status. That's the only difference of pre-certification and post-certification. It has to do with the remedies involved. This case does not involve a minor dispute subject to the... Remedies? Yes. Doesn't a post-certification dispute have to involve a fundamental blow? I mean something... What is a fundamental blow? I have no idea and Justice O'Connor did not say what it might be. But consider the situation. The parties are at war with one another. They're engaging in economic self-defense. And TWA... TWA tried to continue operations with replacement flight attendants once its flight attendants struck. The question was whether there would be any restraint on TWA's right to use replacements. The court said no. But Justice O'Connor held out the possibility that the union might have done something that dealt such a fundamental blow as the TWA is to try out... Where I can't get my hands around this is this is union versus union here. We're not union versus employer. Employer versus union. This is union versus union. I've heard that from you, Judge Barry and from Judge Ackerman very clearly. The rights in Section 2.4 are individual rights. They belong to employees. They do not belong to unions. We are here for Plaintiff Tompkins and Plaintiff Carruthers and our members similarly situated. We're not enforcing our own rights here. We're enforcing the rights of employees. As I said, what we're trying to do is... We're all... What we're trying to do is avoid the situation set up by the carriers whereby there will be dues paid to one organization and seniority maintenance fees paid to another organization all the while evading the safe harbor of Section 2.11. We're acting for the employees. This case is employee oriented. It is not union oriented. We will take the case under advisement. We will not issue any opinion for two weeks in the event that the parties should determine that an alternative disposition of this case would be appropriate. Understood? Thank you, Your Honor. Thank you. Clerk, we'll adjourn court, please.